IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK SKIBA | ) | |
| | ) | No. 15 C 5353 |
| Plaintiff, | ) | |
| vs. | ) | **JURY DEMAND** |
| | ) | |
| CANADIAN NATIONAL RAILWAY | ) | |
| COMPANY, a Canadian corporation and | ) | Judge Ronald A. Guzman |
| ILLINOIS CENTRAL RAILROAD, an | ) | |
| Illinois corporation, CANADIAN | ) | Magistrate Judge Sheila M. Finnegan |
| NATIONAL TRANSPORTATION, Ltd. an | ) | |
| Illinois corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT ILLINOIS
CENTRAL'S MOTION FOR SUMMARY JUDGMENT**

Jeffrey R. Kulwin
KULWIN, MASCIOPINTO & KULWIN, LLP
161 North Clark Street, Suite 2500
Chicago, Illinois 60601
312-641-0300

# I. INTRODUCTION

Plaintiff Mark Skiba (Plaintiff) worked as a management employee for defendant the Illinois Central Railroad, a subsidiary of the Canadian National Railway Company (Defendant). Plaintiff alleged, among other things, that he was the victim of unlawful retaliation and discrimination when Defendant decided to abolish his management job and failed (and refused) to transfer or hire Plaintiff to fill any of the many open management jobs Plaintiff was qualified to fill and, instead filled those positions with substantially younger and less qualified individuals.

As discussed below, Defendant's motion for summary judgment should be denied. The evidence in this case, viewed in the requisite light most favorable to Plaintiff, demonstrates that a jury could (and likely would) conclude that Defendant retaliated and discriminated against Plaintiff for unlawful reasons—evidence that includes, among other things, discriminatory remarks, disparate treatment, and pretextual explanations for employment actions that extinguishes any possible doubt regarding the existence of evidence to support Plaintiff's claims. Summary judgment should be granted only in the clearest of cases, and clearly this is not one of them. As a result, Defendant's motion should be denied.

## II. SUMMARY OF THE FACTS[1]

### A. The Parties

Plaintiff is 64 years of age and an American citizen. ¶ 81. For almost 40 years, Plaintiff developed, earned and established professional management experience in the transportation industry including railroad, trucking, and HR-related positions. ¶ 81, 86-88. The Canadian National Railway ("CN"), is in the rail and related transportation business in Canada and the United States. ¶ 82. Defendant is a subsidiary of CN. Id. CN has mostly Canadian employees and manages its operations in Canada and the U.S. "as one business segment." Id.

---

[1]. Citations reference Plaintiff's Rule 56.1 Statement and Appendix of Exhibits. Plaintiff incorporates his Local Rule 56.1 Statement herein. Sojka v. Bovis, 686 F.3d 394, 398 (7th Cir. 2012).

### B. Defendant's Hiring Policies and Practices

Defendant has no formal written policy or standard procedures for filling management jobs. ¶ 93. However, CN's HR states that, for U.S. positions, "All people who are qualified for the position must be interviewed." ¶ 92. Defendant uses a computer system to post open jobs, to solicit candidates for open jobs, and to notify candidates when jobs are filled or no longer available. ¶ 95. On occasion, Defendant uses HR recruiters and a manager supervising the job, sometimes called a hiring manager, to interview and hire candidates. Id. Defendant claims it prefers internal candidates over external ones, but Defendant has no standard procedure or method for conducting interviews. ¶ 93-94. Defendant also fills management jobs in other ways, e.g., jobs that are not posted on the computer system and some jobs without "formal" interviews. ¶ 96. Defendant's senior management employees in Canada can and do decide to move management employees into other management jobs, and they have the authority to decide whether or not to "release" employees from moving from one job to another job. ¶ 84.

### C. Plaintiff's Employment

In 2008, Defendant hired Plaintiff into a management position after he graduated from the Rail Road Trainee Program (RRTP). ¶ 86-88.[2] By 2012, Plaintiff was promoted three times to different management jobs. Id. In 2011, Defendant promoted Plaintiff to the position of Supervisor in the Motive Power Department. Id. Senior management employee, CN Network Director Jim Voytacek (CN Director Voytacek), described Plaintiff as a "good interviewer" and "top three for sure" (¶ 89):

> I really enjoyed it. I thought it was a good interview. He spoke very confidently. He had - he was very -- seemed like he was confident in his ability to step onto the job . . . He also spoke of his time with FedEx and how he helped manage, you know, the fleet . . . [H]e just seemed very confident and orderly and focused, and he really, really wanted the job . . . It was a good interview. I enjoyed it. . .

---

[2] Graduates of the RRTP program were qualified to work in nearly every entry manager job across the three operational departments: transportation, mechanical, and track and signals. ¶ 87.

### D. The Motive Power Department Complains to HR About Daniel Clermont

Beginning in 2011, the Motive Power Department was directly supervised by Canadian Daniel Clermont (Clermont). ¶ 89. Clermont reported directly to his superiors in Canada, CN Director Voytacek and CN Vice-President Albert Nashman (CN VP Nashman). ¶ 83. Between 2011 and 2012, CN Director Voytacek and CN VP Nashman arranged for the transfer of and/or released several of Plaintiff's co-workers into other management jobs. ¶ 23-25. In 2012, Plaintiff requested a transfer based on Clermont's conduct and he began submitting applications to open management jobs in the CN computer system. ¶ 100.

In 2012, Plaintiff's co-worker Nigel Flenar (Flenar) filed a formal complaint with HR against Clermont. ¶ 98. Plaintiff was interviewed by HR regarding the incident. Id. On June 15, 2012, CN HR determined, based on Flenar's complaint, that Clermont had acted inappropriately. Id. Three days later, on June 18, 2012, Clermont gave Flenar a letter threatening "dismissal". Id. On July 23, 2012, Clermont called HR Director Allan Rothwell (HR Rothwell) to state that "Nigel Flenar is released." ¶ 99. Flenar's Supervisor position was eliminated and he was forced to take a non-management-level union position. ¶ 41.

On September 16, 2012, Plaintiff made a written report to HR about Clermont, which he characterized as a "personality conflict" because he feared the same type of retaliation Flenar suffered. ¶ 100. The next day, on September 17, 2012, Clermont called HR Rothwell to report that he "has performance issues with [Plaintiff]" but he also told HR Rothwell that he has "nothing documented." Id. HR Rothwell told Clermont "we also have a complaint from [Plaintiff] who requests to transfer." Id. On September 21, 2012, HR completed its investigation into Plaintiff's report and concluded that Clermont "did not act consistent with [Defendant's] expectations" and that "appropriate corrective measures" would be taken against Clermont, which was nothing more than a meeting with HR Rothwell. ¶ 101.

3

On October 14, 2012, Plaintiff filed a formal complaint with HR against Clermont citing, among other issues, "providing a continual hostile environment," "retaliation . . . for previous complaints, as well as, testimony requested by HR [about Clermont]", and "discrimination." ¶ 102. The next day, on October 15, 2012, Clermont disciplined Plaintiff and sent to HR a "Work Performance" letter stating, among other things, that Plaintiff's work performance was "unsatisfactory." ¶ 103. Several contentions in the letter were false and Plaintiff was given no opportunity to respond to them. Id. After Plaintiff emailed to HR his formal complaint against Clermont, CN VP Nashman called HR Rothwell to state that he "is reducing power desk in the US to only two positions. [Plaintiff] was likely to be surplus. Timing uncertain." ¶ 104.

### D. Defendant "Abolishes" Plaintiff's Position

On January 15, 2013, CN Director Voytacek and VP Nashman told Plaintiff that his Supervisor position was "abolished" effective January 21, 2013. ¶ 13. Defendant "undertook significant efforts" to assist Plaintiff in finding another management job after his position was eliminated, including "providing a lengthy paid leave to allow him time and the opportunity to seek another position, and assisting him with finding available positions." ¶ 108. On January 31, 2013, CN Director Voytacek gave Plaintiff a written offer for a union non-management position as a Clerk which would cause Plaintiff to lose management salary, benefits and seniority. ¶ 15. Plaintiff was given a leave of absence through February, 2013, while he searched for a substitute management job. ¶ 108. On February 4, 2013, unbeknownst to Plaintiff, CN Director Voytacek wrote to HR Rothwell stating about Plaintiff: "The problem . . . is not that there are no jobs in management available . . . . But rather no one wants him." ¶ 107. HR Rothwell told Plaintiff that, despite the fact he had several pending applications and had interviewed for management jobs that remained pending, if he did not accept the union Clerk position at the end of February, he would have to discuss Plaintiff's "transition" from CN.

4

On March 4, 2013, Plaintiff first began working in the Clerk position and, on that date, he lost his management salary, seniority and benefits. ¶ 16. Plaintiff was placed on 120-day probation in the Clerk position and he continued to pursue management jobs, including some with the help of HR Rothwell. ¶ 109. Plaintiff continued to receive certain management benefits and his position was considered to be "tentative" during this time period. Id. On March 27, 2013, Plaintiff stated to HR, among other things, that he had not heard back from HR about his complaint and that Clermont's unsubstantiated and "retaliatory" letter was "adversely affecting" his ability to get a substitute management-level position. ¶ 106.

### E.  Plaintiff's Futile Efforts to Obtain a Management-Level Position

Between the summer of 2012 and the summer of 2013, Plaintiff applied to dozens of management jobs he was qualified to fill. ¶ 45.  Plaintiff never received an interview for dozens of these jobs, notwithstanding Defendant's stated policy that "all" qualified applicants "must be interviewed" for open and posted jobs. ¶ 45, 63-69, 73.  Defendant hired individuals who were under 40 years of age, substantially younger than Plaintiff and obviously less qualified than Plaintiff. ¶ 110. Unlike Plaintiff, Clermont was neither disciplined nor lost his management job. ¶ 12. Clermont was allowed to move back to Canada to hold the same position supervising U.S. employees, including the Motive Power Department where Plaintiff worked. Id.

### III. SUMMARY JUDGMENT STANDARDS

Defendant is only entitled to summary judgment if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Doe v. Lee, 943 F. Supp. 2d 870, 873 (N.D. Ill. 2013) (citations omitted.). The Court does not "weigh evidence or determine the truth of the matters asserted" and must "view all evidence and draw all inferences in favor of the non-moving party." Id. Summary judgment is appropriate "only when the record as a whole establishes that no reasonable jury could find for the non-moving party." Id.

5

## IV. DEFENDANT'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED

As discussed below, the reasons Defendant contends it is entitled to summary judgment are meritless and should be rejected.

### A. Defendant's Meritless Argument that Plaintiff's Claims Are Partially Time-Barred

Defendant claims erroneously that Plaintiff's claims are partially time-barred for any event occurring before March 4, 2013, which is 300 days before Plaintiff filed his EEOC Charge. (Dkt. 51, p. 3-4.) Defendant makes this argument, presumably, to exclude positions for which Plaintiff was rejected before March 4, 2013 and for the adverse employment action he suffered when his Supervisor position was eliminated and he was forced to accept the Clerk position. Under federal law, Plaintiff was required to file his EEOC Charge within 300 days of suffering a materially adverse employment action; one that visits upon a plaintiff "a significant change in employment status" (Boss v. Castro, 816 F.3d 910, 917 (7th Cir. 2016)) and typically involves "economic injuries" (Whittaker v. NIU, 424 F.3d 640, 647 (7th Cir. 2005)).

Here, with respect to specific positions to which Plaintiff applied, there is no dispute that Plaintiff was denied specific jobs within 300 days of filing his EEOC Charge, including at least Position Nos. 2069, 2072, 2561, 3098. (Dkt. 51, p.8.) Plaintiff was also denied interviews for positions including Position Nos. 1680, 2331, 2332, 3002, 3053, 3090. See ¶ 63-65, 68-69, 73.

With respect to the Clerk position, Defendant admits that Plaintiff filed his EEOC Charge within 300 days of being forced to accept the union Clerk job, so contrary to Defendant's claim, there is no time bar to exclude that job action. (Dkt. 9 ¶ 32.) Here, the actionable material adverse employment action relating to the elimination of Plaintiff's Supervisor position occurred on March 4, 2013—the date when Plaintiff was first forced to accept the union Clerk job to avoid termination, the date when he suffered a significant change in his "employment status" and the date when he suffered material economic injury from Defendant's conduct. Defendant admits

6

that the Clerk position Plaintiff started on March 4, 2013 involved different pay, seniority and benefits. (Dkt. 9 ¶ 26.) As such, Plaintiff timely filed his EEOC Charge in time to challenge the change of his position from a management job to a union job.

While it is true that the circumstances that led to the March 4, 2013, material adverse employment action began to accrue in 2012, he was not terminated on that date and, in fact, Defendant specifically did not terminate him throughout February, 2013, while trying to secure other management jobs. "There is no rule" that a plaintiff who has been repeatedly discriminated against by his employer cannot challenge any of the discriminatory acts unless he files his EEOC charge within 300 days after the first such act. See Stuart v. Local 727, 771 F.3d 1014, 1018 (7th Cir. 2014). Indeed, the evidence is that Plaintiff reasonably believed—even after starting the union Clerk job—that he had open and pending possibilities to get a substitute management job based on, *inter alia*, Defendant's employment practices, his pending HR complaint and request for transfer, the open positions for which he had applied and/or interviewed and the "significant efforts" Defendant says it undertook to assist Plaintiff. See ¶ 108.

Even assuming *arguendo* that Plaintiff was required to file is EEOC Charge before March 4, 2013, equitable estoppel precludes Defendant from asserting this defense. Specifically, the evidence here has, at the very least, raised the inference that Defendant acted in an affirmative manner to prevent Plaintiff from filing his EEOC Charge within the limitations period by, among other ways, granting his paid leave of absence request, by having HR Rothwell continuing to discuss with Plaintiff the possibility of his re-employment in a management job and continuing to investigate his October 14, 2012 HR complaint and request for transfer. See, e.g., Dauzvardis v. Midwest Generation, L.L.C., No. 01 C 8549, 2002 WL 31017436, at *5 (N.D. Ill. Sept. 9, 2002). Under these facts, "equitable estoppel would prevent the running of the limitations period" and Plaintiff's claim would not be barred by the 300-day rule. Id.

7

### B. The Meritless Argument that the EEOC Charge Did Not Include Retaliation

Defendant contends erroneously that Plaintiff's retaliation claim is barred purportedly because he did not check the "retaliation" box on the form and did not allege it in his EEOC Charge. (Dkt. 51 p. 5-6.) The scope of an EEOC Charge is construed liberally. Farrell v. Butler University, 421 F.3d 609, 616 (7th Cir. 2005). When applying this standard, all claims that are reasonably related to and grow out of the EEOC Charge's allegations are allowed. Lavalais v. Village of Melrose Park, 734 F.3d 629, 634 (7th Cir. 2013).

Here, the Plaintiff's EEOC Charge alleges unlawful conduct leading to his reclassification as a union Clerk and his inability to get another management job. Those circumstances clearly involved Plaintiff's contention that he suffered retaliation for engaging in protected activity with HR. An investigation into his claim would have, and in fact did, reveal his retaliation claim. See Edwards v. Illinois Dep't of Fin., No. 12 C 00371, 2016 WL 5233460, at *5 (N.D. Ill. Sept. 22, 2016). Plaintiff's narrative letter submitted to the EEOC to support his EEOC Charge described in detail his retaliation claim, and the EEOC investigator notes show that the EEOC investigated Plaintiff's retaliation claims. See Exs. 12, 40-41. As such, Plaintiff's retaliation claim was presented to the EEOC, grew out of Plaintiff's EEOC Charge allegations and was investigated by the EEOC. Id. It does not matter whether the retaliation box is checked because, among other reasons, the Seventh Circuit has stated that "What boxes, for instance, are checked on the EEOC form do not necessarily control the scope of a subsequent civil complaint." Kristufek v. Hussmann Foodservice Co., 985 F.2d 364, 368 (7th Cir.1993).

### C. The Meritless Argument that Plaintiff Allegedly Did Not Engage in Protected Activity

On his retaliation claim, Plaintiff must establish that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between his protected activity and the adverse employment action. See, e.g., Coleman v.

8

Donahoe, 667 F.3d 835, 840, 859 (7th Cir. 2012). Defendant contends only that there is insufficient evidence to establish that Plaintiff engaged in "protected activity" (thereby conceding, for summary judgment purposes, that there is sufficient evidence on the other elements, which is plainly the case here). (Dkt. No. 51, p. 6-7). Defendant asserts wrongly, however, that Plaintiff's interactions with HR do not constitute "protected activity" because he purportedly did not mention in his complaints "protected class" and he allegedly did not provide "facts sufficient to raise an inference of discrimination." Id. This misstates the law.

Under federal law, to engage in "protected activity," an employee must only "sincerely and reasonably" believe he is complaining about or opposing unlawful work conduct. Castro v. DeVry Univ., Inc., 786 F.3d 559, 564 (7th Cir. 2015). Here, Plaintiff's conduct, viewed in the light most favorable to Plaintiff, demonstrate clearly that Plaintiff reasonably and sincerely believed he was opposing and complaining about unlawful work conduct.

For example, Plaintiff's September 16, 2012, email, and his testimony about it, shows that Plaintiff was trying to artfully complain about unlawful work conduct based on his justifiable worry about unlawful retaliation based on what he observed happen to Flenar. See ¶ 100-01. Plaintiff's October 14, 2012 report to HR specifically discussed Clermont's conduct in "providing a continual hostile environment," "retaliation . . . for previous complaints, as well as, testimony requested by HR [about Daniel Claremont]", and "discrimination"—all conduct that would violate federal employment laws. See ¶ 102. Plaintiff's March 27, 2013 report to HR addressed specifically unlawful retaliation for his complaints to HR and opposition to unlawful work conduct. Id. ¶ 106. Plaintiff's email to his supervisor clearly referenced that he could be a victim of age discrimination in violation of the ADEA if he did not get another management job. (Ex. 65, p. 4). Whether or not Clermont's conduct actually violated the law "does not matter." Castro, 786 F.3d at 564.

9

Here, Plaintiff (and his co-workers) "sincerely and reasonably believed they were complaining about unlawful conduct" which is all that is required to establish protected activity." Id. The cases Defendant cites in support of its contention shows why the evidence in this case is sufficient to deny summary judgment on the retaliation claim.[3] The facts here, viewed in the light most favorable to the Plaintiff, establish that he engaged in protected activity.

### D. Summary Judgment Should Be Denied on the ADEA Claim

In Count I, Plaintiff alleged an ADEA claim. (Dkt. No. 1.) To withstand summary judgment, Plaintiff must show that he is in a protected class, that he suffered a materially adverse employment action and that a reasonable jury could find the adverse employment actions was motivated by discriminatory animus. Ortiz v. Werner Enterprises, Inc., No. 15-2574, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016); Boss v. Castro, 816 F.3d 910, 916 (7th Cir. 2016).

On each claim, the "simple requirement" is that Plaintiff in "one way or the other" must present evidence showing that he is in a protected class, that he suffered adverse employment actions, and that a rational jury could conclude that Defendant took adverse actions on account of his protected class, not for any non-invidious reason. Ortiz 2016 WL 4411434, at *4; Miller v. St. Joseph Cnty., 788 F.3d 714, 716 (7th Cir. 2015) (citations omitted). The evidence in this case, viewed in the requisite light most favorable to Plaintiff, plainly demonstrates that Plaintiff easily meets that burden.

**First**, Defendant does not dispute that Plaintiff is over 40 years of age and within the protected class of the ADEA. (Dkt. 51, p. 9.)

---

[3] In Tomanovich v. City of Indianapolis, 457 F.3d 656, 664 (7th Cir. 2006), the plaintiff alleged that he complained about sexual harassment, but the record did not support his characterization unlike the facts here. In Ashkin v. Time Warner Cable Corp., 52 F.3d 140, 144 (7th Cir. 1995), the plaintiff's complaint arose solely out of a personality clash between "two aggressive individuals." Here, the evidence establishes that Plaintiff, and his co-workers, sincerely and reasonably perceived Clermont was engaging in unlawful work conduct and, unlike Ashkin, there is no evidence that Plaintiff caused or contributed to the conduct.

10

**Second**, Plaintiff clearly suffered several adverse employment actions within 300 days of filing his EEOC Charge. For example, Plaintiff lost his management salary, benefits and seniority when he first began to work as a union. See p. 5, supra. There also is no dispute that Plaintiff was denied several management jobs and interviews within 300 days of when he filed his EEOC Charge, including Position Nos. 2069, 2072, 2561, 3098 (Dkt. 51, p. 9, 11) among others, and that he was not even interviewed for some even though he was qualified and Defendant, by its own admission, was supposed to interview all qualified applicants.

Defendant asserts (wrongly) that Plaintiff was denied Position 2348 more than 300 days before he filed his EEOC Charge. (Dkt. 51, p. 4.) However, Defendant's own computer records show that the position was not filled until April 2, 2013—after March 4, 2013 and within 300 days of filing his EEOC Charge. See Ex. 68 p. 8. Plaintiff testified that he did not find out that he did not get many pf the jobs he applied for until the end of March, 2013. See ¶ 47. At the very least, fact disputes about when Plaintiff was denied Position 2348 preclude summary judgment on that adverse employment action.

**Third**, there is ample evidence, viewed in the light most favorable to Plaintiff, to establish that Plaintiff suffered adverse employment actions based on age. To make this showing, Plaintiff must "marshal sufficient evidence"—direct, circumstantial, or some combination of the two—that points directly to a discriminatory reason for the adverse employment action. Boss, 816 F.3d at 916; Ortiz, 2016 WL 4411434, at *4 ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence.").[4]

---

[4] Defendant's summary judgment arguments rely upon the "direct-method" evidence and "the indirect-method" evidence analysis recently rejected by the Seventh Circuit. See Ortiz, 2016 WL 4411434, at *4.

11

Direct evidence is something akin to an "overt" or "explicit" admission by an employer that its decision was based on a proscribed criterion. Boss, 816 F.3d at 916. Circumstantial evidence includes (1) suspicious timing, ambiguous statements (oral or written), or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action. Boss, 816 F.3d at 916–17. All of this evidence exists here.

*Age-Bias Statements and Stereotypes*. The Seventh Circuit has stated that "remarks and other evidence" that reflect a propensity by decision makers to "evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality." Venters v. City of Delphi, 123 F.3d 956, 973 (7th Cir. 1997); Wichmann v. S.I.U., 180 F.3d 791 (7th Cir. 1999) *vacated on other grounds* (discriminatory comments can serve as evidence of discrimination).) The Seventh Circuit has held that a plaintiff may prevail he can show that an interviewer relied on "stereotypes" in making the employment decisions. Bruno v. City of Crown Point, Ind., 950 F.2d 355, 362 (7th Cir.1995).

Here, there are several statements made by Defendant's senior management employees and decision makers relating directly to the jobs at issue here that, when viewed in the light most favorable to Plaintiff, establish Defendant's discriminatory intent based on his age. For example, with respect to the elimination of the Supervisor position and being forced to accept the non-management Clerk position, Plaintiff testified that CN Director Voytacek asked him about his age at his interview. See ¶ 90. HR Rothwell described Plaintiff to his superior in explaining Plaintiff's re-assignment to the Clerk position as a "later career person." See ¶ 105.

With respect to the positions (and interviews) Plaintiff was denied, Defendant's own self-serving descriptions of Plaintiff's interviews admit to relying upon obvious age-biased

stereotypes. See, e.g., ¶ 52-53 (Position 2069 & 2072: Plaintiff "would not respond well to the need for additional training"); ¶ 114 (Position 2561: the young employee hired would be more "quick" in grasping different parts of the job); ¶ 57, 120 (Position 2348: Plaintiff was "low energy"); Ex. 78. (Position 2332 (hiring manager concerned about the "retirement" age of candidates)). These statements, about the very employment actions involved here, reveal the very kind of age-biased stereotypes sufficient to establish unlawful age discrimination. Jordan v. CTA., No. 10 C 3791, 2014 WL 6910284, at *4 (N.D. Ill. Dec. 9, 2014).

*Systematically Better Treatment of Substantially Younger Employees*. The undisputed evidence about the employees Defendant transferred and/or hired into other management positions, viewed in the light most favorable to Plaintiff, would allow the jury to conclude that Defendant took adverse employment actions against Plaintiff based on his age. See ¶ 110. For example, Plaintiff identified (and Defendant has since admitted) that several substantially younger management employees (in some cases more than 20 years younger) were transferred into other positions, including at least two from the Motive Power Department. See, e.g., ¶ 23-25, 38, 67, 110. Plaintiff identified (and Defendant has since admitted) that many younger management employees received other management positions even though they were disciplined, demoted or engaged in serious misconduct, none of which was the case with Plaintiff who, prior to these events, had a decorated and unblemished work record. See, e.g., ¶ 27, 34, 36.

Defendant claims some of these jobs were not transfers and filled through an interview, but Defendant has admitted to filling positions without "formal" interviews. Defendant asserts that some of the employees claim they did not know Plaintiff's age (Dkt. 51, p. 13), but federal law supports the inference that employers know the age of their employees. Reed v. Navistar, Inc., 2016 WL 1270431, at *6 (N.D. Ill. Mar. 31, 2016)(citations omitted). Regardless, and unsurprisingly, Defendant's computerized work records for Plaintiff shows his age. See Ex. 61.

***Pretext Evidence***.  The evidence in the record, viewed in the requisite light most favorable to Plaintiff, establishes that the jury could "infer intentional discrimination" based on evidence that Defendant did not "honestly believe" the reasons it gave for its employment actions, e.g., "weaknesses, implausibilities, inconsistencies, or contradictions" in the reasons given "that a reasonable person could find [them] unworthy of credence." Coleman, 667 F.3d at 852-53.  Here, there is substantial pretext evidence.  For example:

- Defendant's failure to follow its policy to interview "all qualified candidates" and, in particular, failed to interview Plaintiff for jobs he was clearly qualified to fill and denied within during the relevant time period and hiring substantially younger employees.  (See ¶ 63, 64, 68-69, 73, 110, 119.)

- Defendant's failure to abide by its stated preference for hiring internal candidates by, among other things, instead, hiring substantially younger external candidates to positions Plaintiff was clearly qualified to fill and denied during the relevant time period.  (See ¶ 52 (Position 2969/2072), ¶ 73 (Position 3098) & ¶ 110.)

- Defendant's violation of the federal Consent Decree by, among other ways, failing to have a structured and standard interview process and training hiring managers about selecting qualified candidates. (See ¶ 60 (Positions 2561) & ¶ 57 (Position 2348).)

- Pretextual reasons regarding the reason Plaintiff's Supervisor position was allegedly "abolished" See ¶ 12 plus Defendant's concession, for summary judgment purposes, that there is sufficient evidence to show retaliation as another reason for job action.

- Position 2348: inexplicable and conflicting testimony about numerical scoring given to candidates during interviews.  (See ¶ 120 (testimony that three interviewers had separate scores / scoring sheet shows only two interviewer with the exact same score).

- Position 2561: scoring results manufactured two years after-the-fact / post EEOC filing to justify the hiring decision (¶ 113, 116), false reasons given why Plaintiff was not selected (¶ 117), inexplicable ratings for interview (¶ 118: Plaintiff got a "2" and 36 year old Lopez a "7" in "experience outsourcing trucks" when Plaintiff had 25 years of experience in the trucking industry and Lopez had 6, Plaintiff and Lopez each got a "7" in "commitment to safety," but hiring manager admitted Plaintiff's resume had a lot of information about his work in safety, and Lopez had none).

- Position 3098:  Changing job requirements after the fact to explain why younger external candidate was hired over Plaintiff who worked for Defendant. (¶ 73.)

- Conflicting testimony about Plaintiff's interview skills. (Compare ¶ 86 ("Plaintiff spoke very confidently" and was a "good interviewer") with ¶ 53 (Position 2069 & 2072 (Plaintiff allegedly had a "limited presentation style") ¶ 57 (Position 2348, Plaintiff allegedly was "plain") ¶ 60 (Position 2561, Plaintiff was allegedly "insulting"); ¶ 105 (Plaintiff "presents poorly").)

- Inexplicable testimony to justify employment decision that Plaintiff did not seem "enthusiastic" or "motivated" during his manager interviews, contrary to evidence that, by all accounts, Plaintiff was desperately trying to secure *any* substitute management position available. (See ¶ 45, 57 (Position 2348); ¶ 111 (Position 2561).

This evidence, viewed in the light most favorable to Plaintiff, demonstrates that a jury could find that Defendant did not honestly believe its stated reasons for its employment actions.

### E. Summary Judgment Should Be Denied on the National Origin Claim

In Count III, Plaintiff alleged a Title VII discrimination claim based on his national origin (American). (Dkt. 1). Defendant seeks summary judgment on this claim for the meritless reason that there is no evidence of any non-American being treated more favorably than Plaintiff. (Dkt. No. 51, p. 7-8). However, the evidence is that Clermont, Canadian and non-American, was treated more favorably than Plaintiff. ¶ 12. Clermont had been found on at least two separate occasions to have violated CN policy, but he did not lose his management job and he was not forced to accept a union position. Id. Plaintiff, on the other hand, followed CN policy by reporting to HR and, viewing the evidence in the light most favorable to Plaintiff, he lost his manager position and was prevented from obtaining another one. This evidence, plus evidence that Defendant employs more Canadian management employees than American management employees, Defendant's superior officers are Canadian, and that Defendant gave shifting explanations for its alleged decision to centralize the Motive Power Department in Canada, viewed in the light most favorable to Plaintiff, should withstand summary judgment. Coleman, 667 F.3d at 840, 846-47 (7th Cir. 2012) (whether similarly situated employees are treated more favorably is "usually a question for the fact-finder.").

15

## V. CONCLUSION

For the foregoing reasons, the Court should deny Defendant's summary judgment motion.

                                                              Respectfully submitted,

                                                              /s/ Jeffrey R. Kulwin

Jeffrey R. Kulwin
KULWIN, MASCIOPINTO & KULWIN, L.L.P.
161 N. Clark, Suite 2500
Chicago, IL 60601
312-641-0300